**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, v. **JOSE SILVA-RENTAS**[1], Defendants. | **Crim. No**. 14-754-2 (DRD) |

**OPINION AND ORDER**

### I.   INTRODUCTION

In 2011, the government was investigating a drug trafficking organization ("DTO") responsible for importing drugs from Vieques, an island off the coast of Puerto Rico, to the main island of Puerto Rico and the United States. On November 3, 2011, federal agents requested Court authorization to intercept cellular communications to and from a cellular phone belonging to Defendant Francisco Pimentel-Maldonado ("Pimentel-Maldonado"), an alleged member of the DTO, pursuant to a wiretap order governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§2510-22. In the application's supporting affidavit, Drug Enforcement Agency ("DEA") agent Jose Rincones swore there was probable cause to believe Defendant Jose Silva-Rentas ("Silva-Rentas" or "Defendant"), a presumed associate of Pimentel-Maldonado, was committing drug trafficking and money laundering offenses in violation of 21 U.S.C. §841(a)(1), 21 U.S.C. §843(b), 21 U.S.C. §846, 18 U.S.C. §1956, and 18 U.S.C. §1957. *See*, *e.g.*, 11-mc-462, Docket No. 7. The Court authorized the interception request that same day. *See id.*, Docket No. 8. Between December 9, 2011 and March 14, 2012, the Court authorized three additional Title III interceptions targeting Pimentel-Maldonado and Silva-Rentas. *See id.*, Docket Nos. 21,

---

[1] Co-Defendant Felipe Gomez-Encarnacion joined Defendant's motion. Consequently, the findings made below apply equally to Defendant Gomez-Encarnacion.

1

34, 37, and 59. Pending before the Court is Defendant's *Motion to Suppress* the evidence compiled by the government through those Title III intercepts (Docket No. 1090). For the reasons provided below, the Court hereby **DENIES** Defendant's *Motion to Suppress*.

## II.     PROCEDURAL BACKGROUND

On December 18, 2014, Silva-Rentas, Pimentel-Maldonado, and fifteen co-defendants were indicted and charged with drug trafficking and money laundering offenses. *See* 14-cr-754, Docket No. 3. Defendant Silva-Rentas was charged with conspiracy to import controlled substances into the United States, in violation of 21 U.S.C. §§ 952, 960, and 963; conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). *See id*.

On October 11, 2016, Defendant Silva-Rentas filed a *Motion to Suppress* all evidence obtained through the Title III wiretaps. *See id.*, Docket No. 1090. Defendant argues the Court's authorization of the wiretaps runs afoul of applicable law. Specifically, Defendant avers:

i)     all four wiretap applications were devoid of probable cause that Defendant Silva-Rentas was committing, or was about to commit, a crime[2];

ii)    that the reasons provided for requesting the Title III intercepts were excessively broad;

iii)   that the wiretap application lacked the requisite necessity because traditional investigative techniques had not been tried with Defendant;

iv)    that the ten-day reports that were filed did not reflect a need for continued interception;

v)     that Defendant is independently entitled to a *Franks* hearing on the issue that the government withheld information on the final wiretap application about a drug transaction being planned by members of the DTO and the government's confidential source;

---

[2] Defendant challenges the probable cause determination as to narcotics-related offenses as well as money laundering offenses.

vi)     that Defendant is entitled to a *Franks* hearing because the government improperly and maliciously omitted information regarding the cooperation of co-Defendant, and alleged leader of the DTO, Carlos Morales-Davila;

vii)     that the government failed to minimize the interception of calls that were not pertinent to the investigation;

viii)     that the affidavits attached to the authorization requests contained "stale" toll, pen register, and trap and trace analysis, as well as stale incriminating calls;

ix)     that the government failed to file a ten-day report with respect to the December 9, 2011 wiretap authorization;

x)     that the government employed unauthorized independent contractors and state agents in conducting their interceptions;

xi)     that the government has unreasonably failed to comply with the requirement to provide an inventory of the recordings, as required by 18 U.S.C. §2518(8)(d);

xii)     that the interception authorized on January 1, 2012 was later voided by the Court's amended order on that same date; and

On December 16, 2016, the government filed its opposition to Defendant's motion. *See id.*, Docket No. 1206. The government countered Defendant's arguments by underlining several portions of the affidavits which supported the Court's determinations on probable cause and necessity prior to authorizing the intercepts. Further, the government averred that it took painstaking measures to avoid the interception of non-pertinent calls and text messages. Lastly, the government contested Defendant's averment that the failure to provide inventories was grounds for suppressing the evidence derived from the intercepts.

### III. ANALYSIS

#### i. Title III

Through the enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§2510-22, "Congress sought to protect the privacy of wire and oral communications while, at the same time, authorizing the use of electronic surveillance evidence obtained by law enforcement under specified conditions." *United States v. Lopez*, 300 F.3d 46, 51 (1st Cir. 2002)(citing *Bartnicki v. Vopper,* 532 U.S. 514, 523 (2001)). The interception, or "tapping," of electronic communications by the government is a

last-resort measure which "is to be distinctly the exception—not the rule." *United States v. Hoffman,* 832 F.2d 1299, 1306 (1st Cir.1987). Once the requesting agency receives the Attorney General's approval for a Title III wiretap request, the agency's presenting officer must file a written application for a wiretap before a district judge. Before authorizing the wiretap, the court must make certain enumerated findings and issue an *ex parte* order establishing the parameters of the interception. *See* 18 U.S.C. § § 2516, 2518(1), (3)-(4).

Once a Title III wiretap has been authorized, the authorization is reviewable by the district court through a motion to suppress. *See United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir. 1989). The statute states:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—(i) the communication was unlawfully intercepted; (ii) the order or authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. §  2518(10)(a).

The reviewing court must ensure the authorization requests and the authorization order comport with the statute's requirements. *See, e.g., United States v. Giordano,* 416 U.S. 505, 515 (1974). In doing so, the Court "must . . .  take the facts as stated in the affidavit," *Ashley*, 876 F.2d at 1073-1074, and the Court must "determine the sufficiency of the affidavit on its face." *Id.*

### ii.   Necessity[3]

---

[3] Defendant's argument that the objective of the wiretap is too broad was not developed. Defendant merely included a conclusory statement of the broad objective of the wiretap with no legal or factual support. Accordingly, the argument is waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)("[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . .  a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.").

4

Defendant argues the government failed to demonstrate a necessity for the wiretap, as the statute requires. Defendant alleges the government had made such progress in its investigation that a wiretap was not necessary when requested. However, Defendant's position finds no footing in the law.

When requesting an intercept pursuant to Title III, the government must provide "a full and complete statement of the facts and circumstances justifying the applicant's belief that an order should be issued . . . [and] a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they appear to be too dangerous or unlikely to succeed if tried." § 2518(1)(b)-(c). This requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Rivera-Rosario*, 300 F.3d 1, 18 (1st Cir. 2002)(quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12 (1974)).

The government must demonstrate that it has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *Hoffman,* 832 F.2d at 1306–07; *see also United States v. Edwards,* 69 F.3d 419, 429 (10th Cir.1995) ("[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping."(citations and internal quotation marks omitted)). However, the government is not required to exhaust all investigative techniques. *See United States v. David,* 940 F.2d 722, 728–29 (1st Cir.1991) (holding the necessity requirement was satisfied without attempting to use search warrants, pen registers, or undercover agents); *but see United States v. Castillo–García,* 117 F.3d 1179, 1194 (10th Cir.1997) ("[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application."). Nor does Title III require the government to "run outlandish risks ... before seeking a wiretap." *Hoffman,* 832 F.2d at 1306.

In reviewing a prior finding of necessity, the "'appeals court role is not to make a *de novo* determination of sufficiency as if it were [the issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" *Lopez,* 300 F.3d at 52–

5

53 (citing *United States v. Ashley,* 876 F.2d 1069, 1074 (1st Cir.1989)).  The issuing court's determination is to be upheld when the reviewing court determines the issuing court could have reasonably concluded that "normal investigatory procedures reasonably appeared to be unlikely to succeed." *United States v. Abou–Saada,* 785 F.2d 1, 13 (1986).

### November 3, 2011 Application

DEA Agent Jose Rincones' November 3, 2011 affidavit in support of the government's first wiretap application was a thirty-nine (39) page document meticulously detailing the investigative techniques already employed by the government, including: oral and written reports; physical surveillance; review of phone subscriber info, toll records, and pen registers; inspection of public information and records; intercepted and recorded conversations and text message; and information from confidential informants and undercover officers. *See* 11-mc-462, Docket No. 7 at page 3.

The agent goes explained that the wiretap was necessary because, to that point, the investigation into the DTO had failed to yield essential information on the nature, extent, and methods of operation of the DTO; the identities and roles of the members of the DTO; the distribution and transfer network of the drugs and money belonging to the DTO; the location of the DTO's records; the source of resources used to finance DTO; the location and disposition of the DTO's proceeds; and the locations and items used in furtherance of the DTO. While accepting that the government had been aided by a confidential source with direct access to Pimentel-Maldonado, Rincones explained that the informant does not have direct access or knowledge of the sources that supply the DTO's drug operations.

Most importantly, Rincones' affidavit makes a detailed showing of why the wiretap is necessary in light of the dangerous, or futile, nature of alternative investigatory methods. Agent Rincones explained how physical surveillance operations would be dangerous in Vieques, a small island which is accessible only by state-run ferries replete with Pimentel-Maldonado's lookouts. Consequently, attempts at physical surveillance would have likely compromised the investigation. Rincones also expressed concern that the

government's undercover operations would be compromised if the government were to begin seizing the DTO's drug shipments. The wiretaps would make the undercover officers dispensable and allow the government to proceed safely against the DTO. In summation, Agent Rincones added that the wiretap was necessary to compensate for the fact that pen and toll register information did not help reveal what the DTO members were discussing.

### December 9, 2011 Extension Application

Agent Rincones first listed the prior investigative techniques employed and then explained how the prior wiretap helped advance the investigation but came short of yielding all the information needed to bring forth an indictment. *See* 11-mc-462, Docket No. 20-2. In addition to restating the reasons why the agent believes conventional investigative techniques would be unsuccessful or dangerous, the affiant mentioned that installing pole cameras in Vieques would be particularly perilous because of the amount of corrupt individuals in Vieques that are on Pimentel-Maldonado's payroll.

### January 12, 2012 Application and March 14, 2012 Extension Application

Rincones' two affidavits in support of the second Title III interception, which began on January 12, 2012, are almost identical to the two prior affidavits. *See id.*, Docket Nos. 33 and 58-2. The January 12, 2012 request was where the government first sought to intercept Silva-Rentas' cellular phone. In the March 14, 2012 affidavit, the agent explained that Defendant Silva-Rentas had changed telephone number between interception periods and sought authorization to tap his new device. The affidavits also contained increasing detail about persons anticipated to be intercepted and their roles in the conspiracy, including assisting with drug transactions and money laundering, the prior authorizations failed to help identify all of Silva-Rentas' drug distributors. Lastly, the agent asseverated that tracking Silva-Rentas' vehicles was particularly difficult because he did not operate any vehicles registered in his name.

### Conclusions on Necessity

After examining the affidavits, the Court is satisfied all four wiretap applications duly complied with the necessity requirement. The agent has set out sufficient facts that support the conclusion of the issuing court that the wiretap was necessary in order to complete the investigation of the DTO. Specifically, the agent explained in detail which investigatory techniques had already been employed and why others would be unsuccessful in light of the location of the DTO's operations, the network of individuals working for the DTO, and the potential dangers undercover agents may face in attempting to further the investigation. *See Rivera–Rosario,* 300 F.3d at 19 (necessity established where government described previously pursued techniques, stated why they were ineffective, and explained why other methods, including grand jury subpoenas and search warrants, were not viable options); *United States v. Santana*, 342 F.3d 60, 65–66 (1st Cir. 2003)(finding necessity where the affidavit stated that physical surveillance and the use of pen register information had been employed; that no confidential informants were available to purchase drugs; that not enough information was known to seek a search warrant; and that garbage searches were not possible.); and *United States v. David,* 940 F.2d 722, 728–29 (1st Cir.1991) (holding that the necessity requirement was shown even though government had not attempted to use search warrants, pen registers, or undercover agents). The fact that the government made increasing progress between interception periods did not eliminate the need for further interception, as the DTO members were adept at evading law enforcement and gaps remained in the investigation. *United States v. Cao,* 471 F.3d 1, 3 (1st Cir.2006)("the *partial* success of the investigation [does] not mean that there [is] nothing more to be done."); and *Ashley*, 876 F.2d at 1073 (in reviewing the adequacy of prior investigatory methods, "the craftiness and wariness of the intended targets is a significant factor to be considered by the court in its determination of whether to authorize electronic surveillance."); *see also United States v. Cartagena*, 593 F.3d 104, 110–11 (1st Cir. 2010)("Section 2518(1)(c)'s "full and complete statement" requirement does not mandate that officers include every single detail of an investigation, even if relevant to the need for a wiretap"(citing *United States v. Yeje–Cabrera,* 430 F.3d 1, 9–10 (1st Cir.2005));  Accordingly, the Court finds the facts provided in the

8

affidavit support the issuing court's determination that the requirement of necessity had been satisfied. *See López,* 300 F.3d at 52 (the government is required to make "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.").

### iii. Probable Cause

Defendant alleges the government's affidavits did not reflect any probable cause to believe he was committing, or about to commit, drug trafficking or money laundering offenses. Although he concedes the affidavits contained probable cause as to Pimentel-Maldonado, Silva-Rentas posits that the affidavits lacked probable cause that he was engaging in criminal conduct. The Court disagrees.

An order of authorization may be entered only upon a showing by the applicant that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . .; there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; [and] there is probable cause for belief that the facilities from […which] the electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3)(a)-(d). However, "the government need not establish probable cause as to all participants in [an intercepted] conversation." *United States v. Bannerman*, 2005 WL 2323172, at *4 (D. Mass. 2005)(citing *United States v. Figueroa,* 757 F.2d 466, 475 (2d Cir.1985)).

The test for determining probable cause under Title III is the same as that for a search warrant. *See United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993) (citing *United States v. Rowell,* 903 F.2d 899, 901–02 (2d Cir.1990) and *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.), *cert. denied,* 433 U.S. 910 (1977)). Probable cause exists when "the affidavit demonstrates in some trustworthy fashion the likelihood that an offense has been or is being committed." *United States v. Santana*, 342 F.3d 60, 64–65 (1st Cir. 2003)(citing *United States v. Vigeant,* 176 F.3d 565, 569 (1st Cir.1999)). Stated differently, probable cause

is present when "a man of reasonable caution" would believe "that an offense has been or is being committed . . ." *United States v. Fleury*, 842 F.3d 774, 779–80 (1st Cir. 2016)(citing *United States v. Clark*, 685 F.3d 72, 75 (1st Cir. 2012)).

The Court is to employ a totality of the circumstances analysis, taking into account all the factors listed in the affidavit, and determine whether there is probable cause to believe a crime was committed or was about to be committed by Defendant Silva-Rentas. *See Massachusetts v. Upton*, 466 U.S. 727, 732 (1984)( "[W]e conclude that it is wiser to abandon the 'two-pronged test' established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations.")(Internal citations and marks omitted). Further, the affidavit "is to be interpreted in a common-sense rather than a hypothetical or hypertechnical manner." *Fleury*, 842 F.3d at 779 (quoting *United States v. Jewell*, 60 F.3d 20, 22 (1st Cir. 1995)).  When reviewing another court's finding of probable cause, the reviewing court must determine whether "the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Villarman–Oviedo,* 325 F.3d 1, 9 (1st Cir.2003).

### November 3, 2011 Application

Agent Rincones' first application for a wiretap was directed at Francisco Pimentel-Maldonado, not Defendant Silva-Rentas. *See* 11-mc-462, Docket No. 7. Based on information received from the confidential source, as well as undercover agents, Agent Rincones argued there was probable cause to believe Pimentel-Maldonado, a Puerto Rico Ports Authority supervisor, was a prominent member of a DTO operating out of Vieques, Puerto Rico. Based on information from investigative sources, the affiant argued there was probable cause to believe Pimentel-Maldonado's phone was being used in furtherance of a drug and money laundering conspiracy in violation of 21 U.S.C. §841(a)(1), 21 U.S.C. §843(b), 21 U.S.C. §846,

18 U.S.C. §1956, 18 U.S.C. §1957. Defendant-Silva-Rentas was named among Pimentel-Maldonado's close associates and was signaled as a possible interception target.

### December 9, 2011 Extension Application

Agent Rincones' second affidavit contained excerpts from recorded conversations, including recordings of Defendant Silva-Rentas. A conversation recorded on Pimentel-Maldonado's phone, between an unknown subject, referred to as "Bebo," and Defendant Silva-Rentas was particularly incriminating. *See id.*, Docket No. 20-2. During this conversation, Silva-Rentas explained to Bebo that an incident during Silva-Rentas boat trip from Venezuela to Vieques, presumably to escort a shipment of drugs, had almost caused him to drown. While explaining how he almost drowned, Silva-Rentas also mentioned that Defendant Carlos Morales-Davila, the alleged leader of the DTO, was captured by authorities during the trip.

### January 17, 2012 Application

This was government's first request to intercept Defendant Silva-Rentas' cellular phone. *See id.*, Docket No. 33. In support of probable cause, the agent summarized Silva-Rentas' prior conversation with Bebo, discussing the dangerous trip from Venezuela to Vieques, as well as several other incriminating exchanges. The agent included a conversation where Pimentel-Maldonado discussed the route taken by Silva-Rentas and Morales-Davila from Venezuela to Vieques. Pimentel-Maldonado later referred to Silva-Rentas as his "compay," or close familial associate, and mentioned that Silva-Rentas was Morales-Davila's most trusted associate. Moreover, the affidavit included the summary of a conversation between Pimentel-Maldonado and Silva-Rentas where they discuss installing chips on cellular phones in order to disguise their narcotics-related conversations as well as several conversations between the two men relating to Pimentel-Maldonado's trip to the Dominican Republic, where he was hosted by Silva-Rentas. Finally, the affidavit contained summaries of text message exchanges where Silva-Rentas discussed drug transactions with other members of the DTO using coded language.

### March 14, 2012 Extension Application

This application identified, in detail, the allegations against Defendant Silva-Rentas. See id., Docket No. 58-2. Silva-Rentas was purportedly responsible for shipment, storage, and distribution of cocaine, marijuana, and heroin from Venezuela to the Dominican Republic and Puerto Rico. The affidavit contained summaries of several conversations where Silva-Rentas discussed logistics of the transportation of the drugs, logistics of transporting money, and other issues related to the DTO's activities.

### Conclusions on Probable Cause

Despite ardent arguments to the contrary, the Court is satisfied that each affidavit contained sufficient probable cause to support interceptions against Defendant Silva-Rentas. The agent described, in increasing detail, Silva-Rentas' alleged role within the DTO, his relationship with Pimentel-Maldonado, and his close ties with alleged leader Morales-Davila. Further, intercepted conversations strongly suggested that Silva-Rentas was engaging in drug trafficking as well as money laundering. These conversations provided probable cause to authorize further interceptions to complete the investigation into the DTO's members, manners, and means. Accordingly, based on the totality of the circumstances, the Court holds there was probable cause to support the issuing court's authorization orders. *See, e.g., Santana*, 342 F.3d 60, 64-65 (finding probable cause under similar circumstances).

#### iv.    *Franks Hearing*

Defendant Silva-Rentas argues he is entitled to a *Franks* hearing because the government misrepresented a key fact in the March 14, 2012 application. Namely, Defendant alleges the government's affidavit alleged that Pimentel-Maldonado was planning a large drug shipment from Venezuela but failed to disclose that the shipment was being planned with the government's own confidential informant. Further, Defendant alleges the government failed to disclose that Defendant Morales-Davila was cooperating with authorities beginning on November 2011, which obviated the need for a continuing wiretap.

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,

and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *United States v. D'Andrea*, 648 F.3d 1, 12–13 (1st Cir. 2011)(quoting *Franks v. Delaware,* 438 U.S. 154, 155–56 (1978). Once the defendant makes the requisite showing, a *Franks* hearing may be held to clarify any allegations of both material omissions and false statements. *Cartagena*, 593 F.3d at 112. Because affidavits in support of Title III applications are presumed valid, Defendant Silva-Rentas must show, by a preponderance of the evidence, that "(1) Agent Rincones made a false statement or omission "knowingly and intentionally or with reckless disregard for the truth," in his affidavit, id. and (2) the affidavit would be insufficient to establish probable cause without any false statement(s) and with any omitted statement(s)." *Fleury*, 842 F.3d at 778 (quoting *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012)).

     Defendant has not demonstrated that he is entitled to a *Franks* hearing. Defendant's allegation that the agent failed to disclose that Pimentel-Maldonado's large drug shipment was being coordinated with a confidential informant is inconsequential. The issuing court correctly found independent support for necessity and probable cause as to both Piementel-Maldonado and Silva-Rentas. The fact that Pimentel-Maldonado was assisted by the government's own informant does not obviate the need for an extended wiretap as the confidential informant was not the only other party involved in the transaction. The government still then needed to find the sources of supply and identify any other members of the DTO. Thus, even if the agent had disclosed that the confidential informant was assisting in Pimentel-Maldonado's drug transaction, the issuing court had independent bases to find both probable cause and necessity. *See, e.g., United States v. Stewart,* 337 F.3d 103, 105 (1st Cir.2003) (district court held *Franks* hearing with government's consent where search warrant affidavits misleadingly omitted multiple pieces of information casting doubt on credibility of informants); *id.* at 105–06 (not error to deny suppression of resulting evidence where omitted information was immaterial to overall determination of probable cause); *id.* at 107

n. 2 ("An evidentiary hearing is required only if the defendant is able to show that alleged misstatements or omissions are material to the probable cause determination.").

Defendant's averment that the cooperation of Morales-Davila was withheld in the wiretap application is unpersuasive. *See Cartagena*, 593 F.3d at 110 (finding Defendant was not entitled to a Franks hearing on allegations that the government had misrepresented the extent of the testimony of a cooperating witness when the affidavit contained "information gathered from several other cooperating informants, video and physical surveillance, analysis of toll and phone records, analysis of pen registers, and seizures of heroin and cocaine."). First, Defendant Silva-Rentas admits that it is only "believed that Morales-Davila [had been cooperating constantly since his arrest]." *See* 14-cr-754, Docket No. 1090 at 34. This is hardly satisfactory. Second, the agent's affidavit disclosed the details of Morales-Davila's post-arrest statement, which suggests the government was not attempting to conceal any information from the court. Notwithstanding, even if the government had the benefit of Morales-Davila's full cooperation from the moment of his arrest, a wiretap was necessary to corroborate Morales-Davila's own testimony. See *United States v. Magee*, 2014 WL 5325814, at *5 (D. Me. 2014)("Gaps in an investigation, and a need to corroborate confidential source information, are appropriate factors to consider in determining necessity."(citing *United States v. Guerra–Marez,* 928 F.2d 665, 671 (5th Cir.1991)).

### v.   *Minimization*

Aside from the arguments discussed above, Defendant moves for suppression on several miscellaneous grounds. First, Defendant alleges the government violated Title III's minimization requirement, which "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects." *Lopez*, 300 F.3d at 57(quoting *Hoffman,* 832 F.2d at 1307). In its minimization efforts, "'[t]he government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required.'" *Id*. (quoting *United States v. Charles,* 213 F.3d

10, 22 (1st Cir.)). The Court is to "make an objective assessment in light of the facts and circumstances known to the government at the relevant points in time." *United States v. London*, 66 F.3d 1227, 1236 (1st Cir. 1995)(internal citations omitted). When making this assessment, the Court should focus on "(1) the nature and complexity of the suspected crimes; (2) the thoroughness of the government's precautions to bring about minimization; and (3) the degree of judicial supervision over the surveillance process." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); see also *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir.1989).

Defendant argues that the statistical summaries of the intercepted calls and messages "demonstrate that the percentage of minimized calls was too low." 14-cr-754, Docket No. 1090 at 26. Nevertheless, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide" to determining whether the minimization was proper. *Lopez*, 300 F.3d at 57 (quoting *Scott v. United States,* 436 U.S. 128, 140 (1978)). Further, in investigating a DTO such as the one charged herein, which was responsible for the importation and distribution of narcotics in most of the northeastern areas of Puerto Rico, "the need to allow latitude to eavesdroppers is close to its zenith." *Hoffman,* 832 F.2d at 1308. As noted by the First Circuit, "the need is but heightened because the conspiracy involves controlled substances—easily concealed, easily transported, likely to implicate international or at least interstate interests." *Id*.; see also *United States v. Quintana,* 508 F.2d 867, 874 (7th Cir.1975)("(l)arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode."). Finally, the DTO members did not speak of their endeavors in layman terms. Instead, they attempted to disguise and code their language in anticipation of potential governmental interference with their communications. That said, "[w]hen the opposition speaks in tongues, there is greater need to listen longer and more closely to conversations which may seem innocuous at first." *Hoffman* at 1308.

Here, the government provided progress reports and statistical summaries of the interception efforts, along with detailed explanations of their efforts to minimize the interception of communications not

15

relevant to the investigation. *See* 11-mc-462, Docket 7 at 34-37; Docket No. 20-2 at 39-41; Docket No. 33 at 52-55; and Docket No. 70-1 at 50-52. Altogether this suggests the government put forth a reasonable, good faith effort to minimize any irrelevant interceptions. Accordingly, the Court finds the investigating agents complied with their obligation to put forth an honest effort to minimize non-pertinent calls. *See Lopez*, 300 F.3d at 57.

### *vi. Remaining Arguments*

In a last-ditch attempt to patch the holes in his arguments, Defendant moves for suppression on grounds (1) that the affidavits attached to the authorization requests contained "stale" toll, pen register, and trap and trace analysis, as well as stale incriminating calls; (2) that the government failed to file a ten-day report with respect to the December 9, 2011 wiretap authorization; (3) that the government employed unauthorized independent contractors and state agents in conducting their interceptions; (4) that the government has unreasonably failed to comply with the requirement to provide an inventory of the recordings, as required by 18 U.S.C. §2518(8)(d);[4] and (5) that the interception authorized on January 1, 2012 was later voided by the Court's amended order on that same date.

Defendant misses the mark. First, his argument that the government requested wiretaps based on stale data was woefully underdeveloped. He provided no evidence that all applications were based on stale markers and provided no legal basis for his claims. The same is true about Defendant's argument regarding the government's failure to file a ten-day report of the December 9, 2011 authorization, the use of civilian contractors[5], and the fact that the January 1, 201 2 wiretap was voided by a subsequent amended order. Nevertheless, even if Defendant were correct in arguing that these missteps by the government amounted to violations of the Title III statute, "it is well-settled that not every failure to comply fully with any

---

[4] This argument has little merit as the Court found good cause to postpone the filing of the inventories. *See* 14-mc-462, Docket Nos. 19, 29, 30, 48, 49, 53, 54, 64, and 65. Thus, the government did not breach its obligations under 18 U.S.C. §2518(8)(d), as Defendant alleges.
[5] Defendant merely "believes" that the government used private contractors. Defendant failed to provide factual or evidentiary support for this allegation. *See* 14-cr-754, Docket No. 1090 at 39.

requirement provided in Title III necessitates suppression." *United States v. Escobar–de Jesús,* 187 F.3d 148, 171 (1st Cir.1999); *see United States v. Donovan,* 429 U.S. 413, 432–34 (1974). The Court may admit the evidence derived from the wiretap "if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." *Lopez*, 300 F.3d at 56 (quoting *United States v. Cunningham,* 113 F.3d 289, 293–94 (1st Cir.1997)). The Court need not go further as the government has aptly satisfied the statutory purpose.

### IV.  CONCLUSION

The Court finds the wiretaps were conducted in accordance with the protections afforded by Title III. The agents demonstrated the necessity for the wiretap, made a sufficient showing of probable cause as to all parties that were intercepted, and made a reasonable effort to minimize the interception of non-pertinent calls. As for the rest of the alleged missteps by the government, the Court is satisfied that these lapses "did not affect the likelihood that the wiretap would be authorized in the first place, nor did it increase the wiretap's intrusion on privacy interests." *Lopez* at 56.  Accordingly, Defendant Jose Silva-Rentas' *Motion to Suppress Title III Intercepts* (Docket No. 1090) is hereby **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of January, 2017.

/s/ Daniel R. Dominguez
DANIEL R. DOMINGUEZ
U.S. DISTRICT JUDGE